AIRGAS, INC., James Hovey, Paula Sneed, David Stout, Lee Thomas, John Van Roden, and Ellen Wolf, Plaintiffs and Counter–claim–Defendants Below, Appellants,

v.

AIR PRODUCTS AND CHEMICALS, INC., Defendant and Counter–claim–Plaintiff Below, Appellee.

No. 649, 2010.

Supreme Court of Delaware.

Submitted: Nov. 17, 2010.

Decided: Nov. 23, 2010.

---

Donald J. Wolfe, Jr., Esquire, Kevin R. Shannon, Esquire, Berton W. Ashman, Jr., Esquire, and Ryan W. Browning, Esquire of Potter Anderson & Corroon LLP, Wilmington, DE; Of Counsel: Theodore N. Mirvis, Esquire (argued), Marc Wolinsky, Esquire, George T. Conway III, Esquire, Garrett B. Moritz, Esquire, Meredith L. Turner, Esquire, and Jonathon R. La Chapelle, Esquire of Wachtell, Lipton, Rosen & Katz, New York, NY, for appellants.

Kenneth J. Nachbar, Esquire, Jon E. Abramczyk, Esquire, William M. Lafferty, Esquire, John P. DiTomo, Esquire, John A. Eakins, Esquire, and Ryan D. Stottmann, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Of Counsel: David R. Marriott, Esquire, and Gary A. Bornstein, Esquire (argued) of Cravath, Swaine & Moore LLP, New York, NY, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Air Products and Chemicals, Inc. ("Air Products") and Airgas, Inc. ("Airgas") are competitors in the industrial gas business. Air Products has launched a public tender offer to acquire 100% of Airgas's shares. The Airgas board of directors has received and rejected several bids from Air Products, including its latest offer that valued Airgas at $5.5 billion, because the board determined that each offer undervalued the company. During this entire attempted takeover period, the market price of Airgas stock exceeded Air Products' offers.

To facilitate its takeover attempt, Air Products engaged in a proxy contest at the last annual meeting of Airgas stockholders. Airgas has a staggered board with nine directors, and three were up for election at that meeting. A staggered board, which Delaware law has permitted since 1899, enhances the bargaining power of a target's board and makes it more difficult for an acquirer, like Air Products, to gain control of its target without the consent of the board.

At Airgas's last annual meeting held on September 15, 2010, Air Products nominated three directors to Airgas's board, and the Airgas shareholders elected them. Air Products also proposed a bylaw (the "January Bylaw") that would schedule Airgas's next annual meeting for January 2011, just four months after the 2010 annual meeting. The January Bylaw, which was approved by only 45.8% of the shares entitled to vote, effectively reduced the full term of the incumbent directors by eight months.

Airgas brought this action in the Court of Chancery, claiming that the January Bylaw is invalid because it is inconsistent with title 8, section 141 of the Delaware Code and the Airgas corporate charter provision that creates a staggered board. Airgas's charter requires an affirmative vote of the holders of at least 67% of the voting power of all shares to alter, amend, or repeal the staggered board provision, or to adopt any bylaw inconsistent with that provision. The Court of Chancery upheld the January Bylaw on the following basis: Airgas's charter provides that directors

serve terms that expire at "the annual meeting of stockholders held in the third year following the year of their election." There is no inconsistency between Airgas's charter provision and the January Bylaw, because the January meeting would occur "in the third year after the directors' election," which (the Court of Chancery found) was all that the Airgas charter requires.

We conclude, as did the Court of Chancery, that the Airgas charter language defining the duration of directors' terms is ambiguous. We therefore look to extrinsic evidence to interpret the intent of the charter language which provides that directors' terms expire at "the annual meeting of stockholders held in the third year following the year of their election." We find that the language has been understood to mean that the Airgas directors serve three year terms. We hold that because the January Bylaw prematurely terminates the Airgas directors' terms, conferred by the charter and the statute, by eight months, the January Bylaw is invalid. Accordingly, we reverse.

## FACTS AND PROCEDURAL HISTORY

### The Charter, the Bylaws, and the Staggered Board of Airgas

Section 141(d) of the Delaware General Corporation Law ("DGCL"), which allows corporations to implement a staggered board of directors, relevantly provides:

The directors of any corporation organized under this chapter may, by the certificate of incorporation or by an initial bylaw, or by a bylaw adopted by a vote of the stockholders, be divided into 1, 2 or 3 classes; the term of office of those of the first class to expire at the first annual meeting held after such classification becomes effective; of the sec-

ond class *1 year thereafter; of the third class 2 years thereafter;* and at each annual election held after such classification becomes effective, directors shall be chosen for a full term, as the case may be, to succeed those whose terms expire. . . . [1]

Ever since Airgas became a public corporation in 1986, it has had a three class staggered board by virtue of Article 5, Section 1 of its charter (the "Airgas Charter" or the "Charter"), which relevantly provides:

Number, Election and Term of Directors. . . . The Directors . . . shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible as shall be provided in the manner specified in the By-laws, one class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1987, another class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1988, and another class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1989, with the members of each class to hold office until their successors are elected and qualified. At each annual meeting of the stockholders of the Corporation, the successors to the class of Directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of stockholders held in the third year following the year of their election.

Similarly, Article III, Section 1 of Airgas's bylaws (the "Bylaws"), which implements Article 5, Section 1 of the Charter, relevantly provides:

---

**1.** 8 *Del. C.* § 141(d) (emphasis added).

Number, Election and Terms.... The Directors ... shall be classified, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as possible, one class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1987, another class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1988, and a third class to hold office initially for a term expiring at the annual meeting of stockholders to be held in 1989, with the members of each class to hold office until their successors are elected and qualified. At each annual meeting of the stockholders, the successors or the class of Directors whose term expires at the meeting shall be elected to hold office for a term expiring at the annual meeting of stockholders held in third year following the year of their election....

Article 5, Section 6 of the Charter requires a supermajority vote to enact a bylaw that is inconsistent with Article III of the Bylaws. Specifically, that Charter provision states:

By–Law Amendments. The Board of Directors shall have power to make, alter, amend and repeal the By–Laws (except so far as the By-laws adopted by the stockholders shall otherwise provide.) Any By–Laws made by the Directors under the powers conferred hereby may be altered, amended or repealed by the Directors or by the stockholders. Notwithstanding the foregoing and anything contained in this certificate of incorporation to the contrary, Article III of the By–Laws shall not be altered, amended or repealed and no provision inconsistent therewith shall be adopted without the affirmative vote of the holders of at least 67% of the voting power of all the shares of the Corporation entitled to vote generally in the election of Directors, voting together as a single class.

Article 5, Section 3 of the Charter requires a supermajority vote to remove an Airgas director without cause. Specifically, that provision states:

Removal of Directors.... [A]ny Director may be removed from office without cause only by the affirmative vote of the holders of 67% of the combined voting power of the then outstanding shares of stock entitled to vote generally in the election of Directors, voting together as a single class.

Airgas has consistently held its annual meetings to enable the staggered directors to serve three year terms. Since it "went public" in 1986, Airgas has held its annual meeting no earlier than July 28 and no later than September 15 of each calendar year. Because Airgas's fiscal year ends on March 31, Airgas traditionally has held its annual meeting in late summer or early fall, to afford Airgas the necessary time to evaluate its fiscal year performance and prepare its annual report.[2] Airgas always has held its annual meetings approximately twelve months apart. It has never held consecutive annual meetings sooner than eleven months, twenty-six days apart, or longer than twelve months, twenty-eight days since the prior annual meeting.

### Air Products' Takeover Attempt

On February 11, 2010, Air Products commenced a tender offer for Airgas

---

2. Over the past twenty-four years, Airgas has held its annual meeting on the following dates: August 3, 1987; August 1, 1988; August 7, 1989; August 6, 1990; August 5, 1991; August 3, 1992; July 28, 1993; August 1, 1994; August 7, 1995; August 5, 1996; August 4, 1997; August 3, 1998; August 2, 1999; August 3, 2000; August 2, 2001; July 31, 2002; July 29, 2003; August 4, 2004; August 9, 2005; August 9, 2006; August 7, 2007; August 5, 2008; August 18, 2009; and September 15, 2010.

shares at a purchase price of $60 per share cash. On July 8, 2010, Air Products raised its offer price to $63.50 per share cash, and on September 6, 2010, Air Products again increased its bid to $65.50 per share cash. The Airgas board rejected all these bids as "grossly inadequate." The market for Airgas stock suggests that the board was correct: since Air Products launched the tender offer, Airgas shares have traded as high as $71.28. The market price closed at $69.31 on November 3, 2010, the day the parties presented their arguments to this Court.[3]

After Airgas's board rejected Air Products' bids, Air Products could have negotiated with Airgas's board to agree on a mutually beneficial price. Instead, Air Products chose to wage a proxy contest to facilitate its tender offer. As part of its takeover strategy, Air Products nominated three persons to stand for election to Airgas's staggered board. Air Products also proposed three bylaw amendments including the January Bylaw, which relevantly provides:

> The annual meeting of stockholders to be held in 2011 (the "2011 Annual Meeting") shall be held on January 18, 2011 at 10:00 a.m., and each subsequent annual meeting of stockholders shall be held in January....

The January Bylaw is significant for two reasons. First, the January Bylaw substantially shortens the terms of the Airgas directors by accelerating the timing of Airgas's annual meeting. The January Bylaw would require Airgas to hold its 2011 annual meeting only four months after its 2010 meeting. That accelerated meeting date would contravene nearly two and one-half decades of Airgas practice, during which Airgas never has held its annual meeting earlier than July 28. That would also mark the first time Airgas held an annual meeting without having new fiscal year results to report to its shareholders. Additionally, if the January Bylaw is valid, Air Products need not wait a year to cause the election of another three directors to Airgas's staggered board, because the terms of the incumbent directors would be shortened by eight months.

At Airgas's annual meeting on September 15, 2010, Airgas shareholders elected the three Air Products nominees to Airgas's board and adopted Air Products' proposed bylaw amendments, including the January Bylaw.[4] Of the 73,886,665 shares voted, a bare majority—38,321,496 shares, or 51.8%—were voted in favor of the January Bylaw. But of the 83,629,731 shares that were entitled to vote, only 45.8% were voted in favor of the January Bylaw.

### Procedural History

Airgas brought this action in the Court of Chancery, seeking a declaratory judgment that the January Bylaw is invalid. Air Products counterclaimed, seeking a declaratory judgment that the January Bylaw is valid. After a trial, the Court of Chancery rejected Airgas's claims and entered final judgment in favor of Air Products. The Court of Chancery held that the January Bylaw had been duly adopted by a majority of the voted shares, and did not conflict with the Charter. After analyzing the January Bylaw under sections 141 and

---

3. The Airgas board, which now includes three Air Products' nominees, continues to *unanimously* reject the bid as "grossly inadequate." *See* Press Release, Airgas Sends Letter to Air Products (Oct. 26, 2010), *available at* http://www.airgas.com/content/pressReleases.aspx?PressRelease_ID=1601.

4. On September 23, 2010, Airgas expanded its board from nine to ten members, reappointing Chief Executive Officer, Peter McCausland, who lost his reelection bid at the September 15, 2010 annual meeting.

211 of the DGCL, the Court of Chancery concluded that the January Bylaw is valid under Delaware law.[5] This appeal followed.

## ANALYSIS

### Standard of Review

 "Because the facts material to these claims are uncontroverted, the issues presented are all essentially questions of law that this Court reviews *de novo*."[6] Corporate charters and bylaws are contracts among a corporation's shareholders; therefore, our rules of contract interpretation apply.[7] If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholders' electoral rights.[8] "Words and phrases used in a bylaw are to be given their commonly accepted meaning unless the context clearly requires a different one or unless legal phrases having a special meaning are used."[9] Where extrinsic evidence resolves any ambiguity, we "must give effect to the intent of the parties as revealed by the language of the certificate and the circumstances surrounding its creation and adoption."[10]

### Section 141(d) of the DGCL, the Annual Meeting Term Alternative, and the Defined Term Alternative

To implement a staggered board, as permitted by DGCL Section 141, corporations typically have used two forms of language. Many corporations provide in their charters that each class of directors serves until the "annual meeting of stockholders to be held in the third year following the year of their election." There are variations on this language, providing (for example) that each class of directors serves until the "third succeeding annual meeting following the year of their election" (collectively, the "Annual Meeting Term Alternative"). On the other hand, some corporations, such as the firm involved in *Essential Enterprises v. Automatic Steel Products, Inc.*,[11] provide in their charters that each class serves for a "term of three years." There are variations on that language as well, such as (for example) that each class of directors serves for "a three-year term" (collectively, the "Defined Term Alternative"). Unlike the Annual Meeting Term Alternative, the Defined Term Alternative unambiguously provides in the charter itself that each class of directors serves for three years.

 Article 5, Section 1 of the Airgas Charter and Article III, Section 1 of its Bylaws both employ the Annual Meeting Term Alternative. The central issue presented on this appeal is whether the Airgas Charter requires that each class of directors serves three year terms or whether it provides for a term that can expire at whatever time the annual meeting is scheduled in the third year following

---

5. *See Airgas, Inc. v. Air Prods. & Chems., Inc.*, 2010 WL 3960599 (Del.Ch. Oct. 8, 2010). Airgas claimed that the January Bylaw is invalid solely on legal and statutory grounds, *i.e.*, that the January Bylaw was inconsistent with the Airgas Charter and the DGCL. No claim is advanced on equitable grounds.

6. *B.F. Rich & Co., Inc. v. Gray*, 933 A.2d 1231, 1241 (Del.2007).

7. *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del.1990).

8. *See id.* at 927.

9. *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del.1983) (citing *Standard Power & Light Corp. v. Inv. Assocs., Inc.*, 51 A.2d 572, 576 (Del.1947)).

10. *See Centaur Partners*, 582 A.2d at 928 (quoting *Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del.1990)).

11. 159 A.2d 288 (Del.Ch.1960).

election. The Court of Chancery adopted the latter view without giving any weight to the uncontroverted extrinsic evidence bearing on the intended meaning of the Airgas Charter.

### The Court of Chancery's Analysis

The Court of Chancery articulated its rationale this way:

Airgas's charter provision is not crystal clear on its face. A "full term" expires at the "annual meeting" in the "third year" following a director's year of election. The absence of a definition of annual, year, or full term leads to this puzzle. Does a "full term" contemplate a durationally defined three year period as Airgas suggests? The charter does not explicitly say so. Then, if a "full term" expires at the "annual meeting," what does "annual" mean—yearly? In turn, if "annual" means "separated by about a year," does that mean fiscal year? Calendar year? . . .

The lack of a clear definition of these terms in the charter mandates my treatment of them as ambiguous terms to be viewed in the light most favorable to the stockholder franchise.

Construing the ambiguous terms in that way, if the "full term" of directors does expire at the "annual meeting" in the "third year" following their year of election, I now turn to what is meant by the "annual" meeting. . . . Because this term is not otherwise defined in Airgas's charter or bylaws, I turn to the common dictionary definition, which defines "annual" as "covering the period of a year" or "occurring or happening every year or once a year." And again, construing the ambiguous terms of the charter in favor of the shareholder franchise, "an-

nual" in this context must mean occurring once a year. . . .

Airgas similarly could have defined "annual meeting" elsewhere in its charter or bylaws to require a minimum durational interval between meetings (i.e. "annual meetings must be held no less than nine months apart"). It could have said that directors shall serve "three-year terms." Had it done any of those things, then a bylaw shortening such an explicitly defined "full term" would have conflicted with its explicit provisions and thereby would have been invalid under Airgas's charter. Airgas, however, did not clearly define these terms. Airgas's charter and bylaws simply say that the successor shall take the place of any director whose term has expired "in the third year" following the year of election.

As such, a January 18, 2011 annual meeting would be the "2011 annual meeting." 2011 is the third "year" after 2008. Successors to the 2008 class can be elected in the "third year following the year of their election" which is 2011. Thus, the bylaw does not violate Airgas's charter as written.[12]

■ We agree with the Court of Chancery that the relevant Charter language is ambiguous. But as more fully discussed below, there is overwhelming extrinsic evidence that under the Annual Meeting Term Alternative adopted by Airgas, a term of three years was intended. Therefore, the January Bylaw is inconsistent with Article 5, Section 1 of the Charter because it materially shortens the directors' full three year term that the Charter language requires. It is settled Delaware law that a bylaw that is inconsistent with the corporation's charter is invalid.[13]

---

**12.** *Airgas*, 2010 WL 3960599, at *6–8 (citations omitted).

**13.** *See* 8 *Del. C.* § 109(b); *Centaur Partners*, 582 A.2d at 929.

### Article 5, Section 1 of the Charter is Ambiguous

■ To determine whether the January Bylaw is inconsistent with the Charter, we first must address Article 5, Section 1 of the Charter. Although the Annual Meeting Term Alternative employed in that section is facially ambiguous, our precedents, and the common understanding of that language enable us to interpret that provision definitively. The "context clearly requires" the interpretation we adopt, because the relevant "legal phrase[ ] ha[s] a special meaning,"[14] and because we "must give effect to the intent of the parties as revealed by the language of the certificate and the circumstances surrounding its creation and adoption."[15] "If there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended."[16] Delaware courts often look to extrinsic evidence for the common understanding of ambiguous language whether in a statute, a rule or a contractual provision.[17]

### Delaware Precedents

Although this Court never has been called upon to interpret the Annual Meeting Term Alternative specifically, the Delaware cases that involved similar charter language regard that language as creating a staggered board with classes of directors who serve three year terms.[18] The Court of Chancery case law similarly reflects the understanding of the Court of Chancery—until this case—that directors of staggered boards serve a three year term.[19] The

14. *See Hibbert*, 457 A.2d at 343.

15. *Centaur Partners*, 582 A.2d at 928 (quoting *Waggoner*, 581 A.2d at 1134).

16. *AT & T Corp. v. Lillis*, 953 A.2d 241, 253 (Del.2008) (quoting *Appriva S'holder Litig. Co., LLC v. ev3, Inc.*, 937 A.2d 1275, 1291 (Del.2007)).

17. *See, e.g., Perry v. Berkley*, 996 A.2d 1262, 1268 (Del.2010) (relying on Federal Rules of Evidence Manual to interpret Delaware Rules of Evidence); *Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244, 251 (Del.2009) (relying on White & Summers treatise to interpret Delaware Uniform Commercial Code).

18. *See Versata Enters. v. Selectica, Inc.*, 5 A.3d 586, 604 (Del.2010) (" '[A] classified board would *delay—but not prevent—a hostile acquirer from obtaining control of the board*, since a determined acquirer could wage a proxy contest and obtain control of two thirds of the target board over a two year period, as opposed to seizing control in a single election.' ") (quoting *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1186 n. 17 (Del.Ch.1998)); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 116 (Del.2006) ("The nine member board of directors is classified and the directors serve three-year terms."); *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118,

1122 (Del.2003) ("The effect is to prevent an insurgent from obtaining control of the company in under two years.").

19. *See eBay Domestic Holdings, Inc. v. Newmark*, 2010 WL 3516473, at *14 (Del.Ch. Sept. 9, 2010) ("The Staggered Board Amendments created three classes of directors, one director per class, with each class serving three-year terms."); *Khanna v. McMinn*, 2006 WL 1388744, at *31 (Del.Ch. May 9, 2006) ("The directors ... completed their three-year terms of office."); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 156 (Del.Ch. 2005) ("Each year the stockholders elect one third of the directors for three year terms...."); *Jones Apparel Grp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 849 (Del. Ch.2004) ("The extent to which a certificate provision could deviate from the default standard of one-year terms for directors was itself set by statute, which limited the deviation to the adoption of a staggered board with members whose three-year terms expire on a rotating basis."); *Roven v. Cotter*, 547 A.2d 603, 603–04 (Del.Ch.1988) (describing the Annual Meeting Term Alternative in the corporate charter as providing the director with a "three year term"); *Dolgoff v. Projectavision, Inc.*, 1996 WL 91945, at *9 (Del.Ch. Feb. 29, 1996) ("It ordinarily requires two years for an opponent to possibly secure a majority of the seats on a staggered board.").

United States District Court for the District of Delaware, applying Delaware law, has reached the same conclusion.[20]

## The Annual Meeting Term Alternative and the Defined Term Alternative in Practice

■ Although practice and understanding do not control the issue before us, we agree with Airgas that "[p]ractice and understanding in the real world" are relevant. Here, we find the industry practice and understanding of similar charter language to be persuasive. Of the eighty-nine Fortune 500 Delaware corporations that have staggered boards, fifty-eight corporations use the Annual Meeting Term Alternative. More important, forty-six of those fifty-eight Delaware corporations, or 79%, expressly represent in their proxy statements that their staggered-board directors serve three year terms. Indeed, Air Products itself uses the Annual Meeting Term Alternative in its charter,[21] and represents in its proxy statement that: "Our Board is divided into three classes for purposes of election, with *three-year terms of office* ending in successive years." [22]

Also noteworthy is the practice and understanding of corporations that have "de-staggered" their boards. Ninety-nine of the Fortune 500 Delaware corporations have de-staggered their boards over the last decade. Of those ninety-nine corporations, sixty-four used the Annual Meeting Term Alternative, and an overwhelming majority—sixty-two, or 97%—represented in their proxy statements that their directors served three year terms. We cannot ignore this widespread corporate practice and understanding it represents. It supports a construction that the Annual Meeting Term Alternative is intended to provide that each class of directors serves three year terms. Air Products has offered no evidence to the contrary.

## Model Forms and Commentary

The ABA's *Public Company Organizational Documents: Model Forms and Commentary* contains the following model charter provision for a staggered board that repeats the language that has been commonly understood for decades to provide for a three year term:

The initial Class I Directors shall serve for a term expiring at the first annual meeting of stockholders of the corporation following the filing of this certificate of incorporation; the initial Class II Directors shall serve for a term expiring at the second annual meeting of stockholders following the filing of this certificate of incorporation; and the initial Class III Directors shall serve for a term expiring at the third annual meeting of stockholders following the filing of this certificate of incorporation. Each director in each class shall hold office until his or her successor is duly elected and qualified. Each director in each class

**20.** *See SWT Acquisition Corp. v. TW Servs., Inc.,* 700 F.Supp. 1323, 1329 (D.Del.1988) ("[T]he [ ] board is staggered [and] thereby preclud[es] [outside] control for two years."); *BNS Inc. v. Koppers Co., Inc.,* 683 F.Supp. 458, 470 (D.Del.1988) ("[A] staggered board delays shifts of control for two years.").

**21.** Article 10 of Air Products' charter provides: "... [T]he directors chosen to succeed those whose terms are expiring shall be identified as being of the same class as the di-

rectors whom they succeed and shall be elected for a term expiring at the third succeeding annual meeting of stockholders or thereafter in each case when their respective successors are elected and qualified...."

**22.** *See* Air Products & Chemicals, Inc., Definitive Proxy Statement (Schedule 14A), at 6 (Dec. 10, 2009) (emphasis added), *available at* http://www.sec.gov/Archives/edgar/data/2969/000119312509250372/ddef14a.htm.

shall hold office until his or her successor is duly elected and qualified. At each annual meeting of stockholders beginning with the first annual meeting of stockholders following the filing of this certificate of incorporation, *the successors of the class of directors whose terms expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of stockholders to be held in the third year following the year of their election,* with each director in each such class to hold office until his or her successor is duly elected and qualified.[23]

Notably, the accompanying commentary explains:

The DGCL permits the certificate of incorporation to provide that the board of directors may be divided into one, two, or three classes, with the term of office of those of the first class to expire at the annual meeting next ensuing; of the second class, one year thereafter; of the third class, two years thereafter, and at each annual election held after such classification and election, *directors elected to succeed those whose terms expire shall be elected for a three-year term.* DGCL Section 141(d).[24]

Thus, this model form commentary confirms the understanding that the Annual Meeting Term Alternative intends to provide that each class of directors is elected for a three year term.

### Other Commentary

The DGCL, from its initial enactment in 1899, has authorized Delaware corporations to stagger the terms of their boards of directors.[25] Although the statutory language has been amended from time to time, it has remained substantially the same over the past one hundred eleven years. As early as 1917, commentators understood that the staggered board provision contemplates three year director terms. In its 1917 pamphlet entitled *Business Corporations Under the Laws of Delaware,* the Corporation Trust Company commented: "[Directors] can be divided into one, two or three classes, to serve one, two and three years, and at each annual meeting the directors are elected to serve for the term of three years, so that one class expires each year. They are elected annually by the stockholders."[26] This historical understanding that directors are elected to serve for the term of three years is significant.[27]

---

**23.** ABA, *Public Company Organizational Documents: Model Forms and Commentary,* 67 (2009) (emphasis added).

**24.** *Id.* (emphasis added).

**25.** *See Insituform of N.Am., Inc. v. Chandler,* 534 A.2d 257, 264–65 (Del.Ch.1987) (citing 21 Del. L. Ch. 273 § 20 (1899)). The 1899 statute provided as follows: "The directors of any corporation organized as aforesaid may, by a vote of the stockholders, be divided into one, two or three classes, the term of office of those of the first class to expire at the annual meeting next ensuing, of the second class one year thereafter, of the third class three years [sic] thereafter; and at each annual election held after such classification directors shall be chosen for a full term, as the case may be, to succeed those whose terms expire."

**26.** CORPORATION TRUST COMPANY OF AMERICA, BUSINESS CORPORATIONS UNDER THE LAWS OF DELAWARE 18–19 (4th ed.1917).

**27.** *See also* ERNEST L. FOLK, III, THE RED BOOK DIGEST OF THE NEW DELAWARE CORPORATION LAW—1967, at 12 (1968) ("[D]irectors may be divided into one, two or three classes, with terms expiring one, two or three years thereafter, after which all directors are chosen for full terms."); S. SAMUEL ARSHT & LEWIS S. BLACK, ANALYSIS OF THE 1974 AMENDMENTS TO THE DELAWARE CORPORATION LAW, 375, 377 (1974) ("The provisions of Section 141(d) ... permit the directors of a Delaware corporation to be 'divided into one, two or three classes,' ... and to serve for staggered terms of three years."); Lewis S. Black, Jr. & Craig B. Smith, *Antitakeover Charter Provisions: De-*

### *Essential Enterprises v. Automatic Steel Products, Inc.*[28]

This same understanding has long been embedded in Delaware case law addressing issues similar to those presented in this case. Fifty years ago, Chancellor Seitz considered in *Essential Enterprises* whether a bylaw that authorized the removal of directors by a majority stockholder vote was inconsistent with a charter provision that provided for staggered, three-year terms for the corporation's directors. Although the charter provided that each class of directors "s hall be elected to hold office for the term of three years,"[29] Chancellor Seitz found that the charter reflected the underlying intent of DGCL Section 141(d), and explained: "While the conflict considered is between the by-law and the certificate, the empowering statute is also involved since *the certificate provision is formulated basically in the words of the statute.*"[30] Holding

that the bylaw that authorized the removal of directors by a majority stockholder vote was inconsistent with the charter provision that authorized staggered three year terms for the corporation's directors, Chancellor Seitz concluded: "Clearly the 'full term' visualized by the statute is a period of three years—not up to three years;"[31] and the bylaw would "frustrate the plan and purpose behind the provision for staggered terms...."[32]

Air Products contends that *Essential Enterprises* and this case are distinguishable in two ways. First, Air Products argues that *Essential Enterprises* was a director "removal" case, whereas this case is an "annual meeting" case. *In form,* the January Bylaw addresses the date of Airgas's annual meeting. But *in substance,* the January Bylaw, like the bylaw in *Essential Enterprises,* has the effect of prematurely removing Airgas's directors who

---

*fending Self–Help for Takeover Targets,* 36 Wash. & Lee L.Rev. 699, 715 (1979) ("By spreading the election of the full board over a period of three years, the classified board forces the successful [tender] offeror to wait, in theory at least, two years before assuming working control of the board of directors."); Arthur Fleischer, Jr. & Alexander R. Sussman, Takeover Defense § 605, at 6–29 (2004) ("Obviously, under a [staggered board], even a majority shareholder cannot accomplish a change in control of the board in less than two years."); Frederick H. Alexander & James D. Honaker, *Power to the Franchise or the Fiduciaries?: An Analysis of the Limits on Stockholder Activist Bylaws,* 33 Del. J. Corp. L. 749, 751 (2008) ("Section 141(d) permits stockholders to adopt bylaws creating a staggered board of directors, in which directors are elected to serve three-year terms...."); Black's Law Dictionary 197 (9th ed.2009) (citing 8 *Del. C.* § 141) (defining a staggered board as a board of directors whose "members serve terms of two or more years, with some members' terms expiring at each annual election"); 1 David A. Drexler, Lewis S. Black & A Gilchrist Sparks, III, Delaware Corporation Law and Practice § 13.01[7] (2009) (A staggered board is one "divided into two or three

classes, each member of which serves either a two or three year term depending upon the number of classes...."); 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations § 4.6 (2010) ("A real benefit to directors on a [staggered] board is that it would take two years for an insurgent to obtain control in a proxy contest....").

**28.** 159 A.2d 288 (Del.Ch.1960).

**29.** The charter provision at issue relevantly provided: "At each annual election, commencing at the next annual meeting of the stockholders, the successors to the class of directors whose term expires in that year shall be elected to hold office for the term of three years to succeed those whose term expires so that the term of office of one class of directors shall expire in each year." *Id.* at 290.

**30.** *See id.* (emphasis added).

**31.** *See id.* at 290–91.

**32.** *See id.* at 291.

would otherwise serve an additional eight months on Airgas's board. In that significant respect this case is indistinguishable from *Essential Enterprises.*

Second, Air Products argues that *Essential Enterprises* is distinguishable because the charter in that case explicitly stated that each class of directors "s hall be elected to hold office for the term of three years," whereas the Annual Meeting Term Alternative does not. While that is true, our preceding discussion demonstrates that the Annual Meeting Term Alternative was intended, and has been commonly understood, to provide for three year terms.

In its opinion, the Court of Chancery distinguished *Essential Enterprises* as follows:

> [*Essential Enterprises* explained] that DGCL Section 141(d) "says that 'directors shall be chosen for a full term.' The certificate implements this." ... The charter in *Essential Enterprises* explicitly called for three-year terms; Airgas's charter does not. Thus, the "full term" specified by the charter in *Essential Enterprises* was three years. The "full term" visualized by the statute based on Airgas's charter is until "the annual meeting of stockholders held in the third year following the year of their election." [33]

Thus, the Court of Chancery heavily relied on the different wording of the Annual Meeting Term Alternative and the Defined Term Alternative to arrive at its conclusion that different wording equates to different meaning. But in doing that the Court of Chancery erred, because it failed to give proper effect to the overwhelming and uncontroverted extrinsic evidence that establishes, and persuades us, that the Annual Meeting Term Alternative and the Defined Term Alternative language mean the same thing: that each class of directors serves three year terms.

 No party to this case has argued that DGCL Section 141(d) or the Airgas Charter requires that the three year terms be measured with mathematical precision.[34] Nor is it necessary for us to define with exactitude the parameters of what deviation from 365 days (multiplied by 3) satisfies the Airgas Charter three year durational requirement. In this specific case, we may safely conclude that under any construction of "annual" within the intended meaning of the Airgas Charter or title 8, section 141(d) of the Delaware Code, four months does not qualify. In substance, the January Bylaw so extremely truncates the directors' term as to constitute a *de facto* removal that is inconsistent with the Airgas Charter. The consequence of the January Bylaw is similar to the bylaw at issue in *Essential Enterprises.* It serves to "frustrate the plan and purpose behind the provision for [Airgas's] staggered terms and [ ] it is incompatible with the pertinent language of the statute and the [Charter]." [35] Accordingly, the January Bylaw is invalid not only because it impermissibly shortens the directors' three year staggered terms as

---

**33.** *Airgas,* 2010 WL 3960599, at *11 (citations omitted).

**34.** We recognize that Delaware corporations have some latitude in setting the date for an annual meeting. *See* 8 *Del. C.* § 211. Therefore, a director's term may properly end at an annual meeting even though that director only served approximately three years rather than exactly three years. In this case, however-

er, we need not decide the parameters of an approximate term of three years because twenty-eight months is not approximately three years.

**35.** *See Essential Enterprises,* 159 A.2d at 291; 8 *Del. C.* § 141(d) (providing that "the term of office ... of the second class 1 year thereafter; of the third class 2 years thereafter...."),

provided by Article 5, Section 1 of the Airgas Charter, but also because it amounted to a *de facto* removal without cause of those directors without the affirmative vote of 67% of the voting power of all shares entitled to vote, as Article 5, Section 3 of the Charter required.

## CONCLUSION

The judgment of the Court of Chancery is **REVERSED.**